# NO. 12-22-00042-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| **KRISTIAN LEONARDO PERDOMO, APPELLANT** | § | **APPEAL FROM THE 114TH** |
| | § | **DISTRICT COURT** |
| **V.** | | |
| | § | **SMITH COUNTY, TEXAS** |
| **THE STATE OF TEXAS, APPELLEE** | | |

## *MEMORANDUM OPINION*

Kristian Leonardo Perdomo appeals his conviction for murder. In five issues, Appellant argues that the trial court erred by (1) failing to declare a mistrial after the State commented on his silence, (2) admitting into evidence an officer's body camera recording, which Appellant contends constituted hearsay and violated his right to confrontation, (3) admitting into evidence two reports that constituted hearsay, (4) admitting evidence of four unadjudicated murders during the punishment phase, and (5) assessing the local consolidated fee on conviction of felony in the bill of costs. We modify the trial court's judgment and affirm as modified.

## BACKGROUND

Appellant was charged by indictment with the murder of Bradley Brockman. He pleaded "not guilty," and the matter proceeded to a jury trial. Officer William Moore of the Tyler Police Department testified that on December 16, 2018, he responded to the scene after a motorist flagged him down and told him he witnessed a shooting. Moore followed the motorist to Westwood Shopping Center in Tyler, where several people reported that they saw a shooting. When Moore arrived at the scene, he saw the victim lying on the ground. Officers recovered a .380-caliber Federal cartridge from the scene. Moore responded affirmatively when asked whether each of the witnesses appeared "to be operating under the excitement of what they had witnessed[.]" Moore

also responded affirmatively when asked, during cross-examination, whether the witnesses could calmly relate to him what they observed. Moore was wearing a body camera, and a copy of the recording was admitted into evidence over defense counsel's running objection. The body camera recorded Moore's discussions with various witnesses at the scene. Two of the witnesses with whom Moore spoke did not testify at trial.

Witnesses testified that the shooter wore a black hoodie or sweater and a red bandana, and fled the scene in a silver car that had a damaged rear end. One witness testified that when she was in the parking lot of the Taco Bell at Westwood Shopping Center, she heard a gunshot and saw a man in a hoodie run to his car and flee the scene. She and her husband followed the shooter's car, obtained his license plate number, and provided the license plate number to law enforcement. Another witness testified that he saw the shooter walk behind the victim, and the shooter covered his face with a red bandana before shooting the victim in the back of the head. The shooter then fled in a vehicle with rear-end damage. The witness followed the shooter's vehicle and called 911.

Dispatch alerted officers to be on the lookout for a silver vehicle with rear-end damage. Officer Kim Ruyle of the Tyler Police Department stopped a silver vehicle with rear-end damage, and Appellant was the driver. The vehicle's license plate number matched the license plate number reported by witnesses. Ruyle arrested Appellant, and investigating officers found a receipt for .380-caliber Federal ammunition in the glove compartment. Upon performing a detailed search of the vehicle after taking Appellant into custody, officers found a red bandana and a silver pistol beneath a panel in the driver's side door.

Stacey Phetteplace, a forensic scientist with the Texas Department of Public Safety, examined and tested the pistol and the cartridge case, as well as the bullet recovered during the victim's autopsy, and she testified that the cartridge case was fired from the pistol recovered from Appellant's car. Phetteplace also testified that the bullet recovered from the victim's body was a .380-caliber bullet, but because the bullet was damaged, she could not conclusively determine whether it was fired from the pistol recovered from Appellant's vehicle. The trial judge admitted a copy of Phetteplace's report into evidence over defense counsel's hearsay objection.

Rebekah Lloyd, a forensic scientist with the Texas Department of Public Safety's trace evidence section, testified that Appellant's hands were positive for gunshot residue. The trial judge admitted a copy of Lloyd's report into evidence over defense counsel's objection that it constitutes

hearsay and is "akin to a police offense report, which is specifically excluded under the Rules of Evidence under hearsay."

At the conclusion of the guilt/innocence phase, the jury ultimately found Appellant "guilty." During the punishment phase, various law enforcement officers and medical examiners testified that in the nine-day period before Brockman was shot, four other victims were murdered by being shot[1] with a .380-caliber gun loaded with Federal ammunition. A ballistics expert testified that the handgun recovered from Appellant's car fired the cartridge casings recovered from the crime scenes at which each of the four additional murder victims was discovered. Defense counsel obtained a running objection to the testimony regarding the four unadjudicated murders.

Due to the similarities between the four unadjudicated murders and the murder of Brockman, authorities suspected Appellant committed the four other murders. Law enforcement officers interviewed Appellant after he waived his *Miranda* rights, and he admitted that he is a member of a criminal street gang. When asked if the murder victims harmed him, Appellant responded, "They didn't have much to do with it." Appellant told authorities that he did not want photographs of the deceased victims shown to his mother. When Appellant was arrested and charged with killing Brockman, the spree of murders ended. The jury also heard testimony that Appellant has previous convictions for robbery and unlawful possession of a firearm by a felon, as well as a juvenile conviction for engaging in organized criminal activity. The jury assessed punishment at imprisonment for life and imposed a $10,000 fine. This appeal followed.

## COMMENT ON RIGHT TO REMAIN SILENT

In his first issue, Appellant contends the trial court erred by denying his motion for mistrial after the prosecutor commented during his opening statement on Appellant's silence.

### Applicable Law

We review the denial of a motion for mistrial under an abuse of discretion standard. *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003). A trial court does not abuse its discretion if its decision is within the zone of reasonable disagreement. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). Mistrial is appropriate only for "highly prejudicial and incurable errors[.]" *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000). A trial court's instruction

---

[1] Three of the victims were shot in the head while standing in or near the doorway of their homes. The fourth victim was shot in the neck and back, and he was found on the side of a road.

to disregard will generally cure any error. *See **Wesbrook v. State***, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). We presume that the jury obeyed an instruction to disregard. *See **Archie v. State***, 340 S.W.3d 734, 741 (Tex. Crim. App. 2011).

In a criminal case, the State's opening statement should outline the facts that the prosecution, in good faith, expects to prove. ***Ketchum v. State***, 199 S.W.3d 581, 597 (Tex. App.— Corpus Christi 2006, pet. ref'd); ***Parra v. State***, 935 S.W.2d 862, 871 (Tex. App.—Texarkana 1996, pet. ref'd). The Texas Code of Criminal Procedure provides that "[t]he State's attorney shall state to the jury the nature of the accusation and the facts which are expected to be proved by the State in support thereof." TEX. CODE CRIM. PROC. ANN. art. 36.01(a)(3) (West 2007). The State should not argue to the jury during opening statement. *See **Hullaby v. State***, 911 S.W.2d 921, 927 (Tex. App.—Fort Worth 1995, pet. ref'd).

A prosecutor is not permitted to comment on an accused's failure to testify because such a comment violates the accused's privilege against self-incrimination and his freedom from being compelled to testify. ***Bustamante v. State***, 48 S.W.3d 761, 764 (Tex. Crim. App. 2001). "To violate the right against self-incrimination, the offending language must be viewed from the jury's standpoint and the implication that the comment referred to the defendant's failure to testify must be clear." ***Id***. "The test is whether the language used was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify." ***Id***. We must analyze the language used in the context in which the comment was made. ***Id***. "A mere indirect or implied allusion to the accused's failure to testify does not violate [his] rights." ***Patrick v. State***, 906 S.W.2d 481, 490-91 (Tex. Crim. App. 1995). A comment is improper if it calls the jury's attention to the absence of evidence that only the defendant's testimony could supply. *See **Crocker v. State***, 248 S.W.3d 299, 304 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). In determining whether an improper comment during the State's opening statement requires a mistrial, we examine (1) the severity of the misconduct, (2) measures adopted to cure the misconduct, and (3) the certainty of conviction absent the misconduct. ***Mosley v. State***, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

**Analysis**

During opening statement, the prosecutor stated as follows:

> The evidence will show that . . . Kristian Perdomo[] is a cold-blooded killer. And so, yeah, it's going to be difficult. It's going to be hard. You're going to have to, as the jurors in the case,

4

> through the State's evidence, confront some of the worst things that a human can do to another human.
>
> But in stark contrast to that, you will also see how strangers who don't know the victim in this case, spring into action, rush to the scene of Mr. Brockman as he's [lying] on the ground bleeding from his head.
>
> Because Kristian Perdomo, for whatever reason – and as we talked about yesterday, we don't know that reason. That evidence that you're going to . . . hear throughout this case, there's not going to be evidence of motive—

Defense counsel objected, "that's an implication to the Fifth Amendment." The trial judge sustained the objection and immediately instructed the jury to "disregard that last statement." Defense counsel moved for a mistrial, and the trial court denied the motion.

Because the complained-of comment was neither a statement of what the State expected to prove or an explanation of the nature of the accusation against Appellant, we conclude that it was contrary to the defined purpose of opening statements. *See* TEX. CODE CRIM. PROC. ANN. art. 36.01(a)(3); *Mosley*, 983 S.W.2d at 259. However, viewing the complained-of argument in context, we further conclude that the prosecutor was explaining that the State need not prove motive rather than alluding to Appellant's failure to testify. *See Bustamante*, 48 S.W.3d at 764; *Cantu v. State*, 395 S.W.3d 202, 211 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (concluding that prosecutor's argument regarding not knowing defendant's motive does not necessarily refer to defendant's failure to testify); *Patrick*, 906 S.W.2d at 490-91. The prosecutor's comment did not call the jury's attention to the absence of evidence that only the defendant's testimony could supply. *See Crocker*, 248 S.W.3d at 304. We therefore conclude that the first *Mosley* factor, the severity of the alleged misconduct, weighs slightly in favor of the State.

With respect to the second *Mosley* factor, measures taken to cure the alleged misconduct, the record shows that the trial court immediately instructed the jury to disregard the prosecutor's statement, and we presume that the jury followed the trial court's instruction. *See Archie*, 340 S.W.3d at 741; *Mosley*, 983 S.W.2d at 259. Therefore, the second *Mosley* factor weighs strongly in favor of the State.

As to the third *Mosley* factor, the certainty of conviction absent the alleged misconduct, the evidence against Appellant was strong, and the evidence was sufficient to support the jury's verdict of guilty. The certainty of Appellant's conviction in the absence of the complained-of comment by the prosecutor was high. *See Mosley*, 983 S.W.2d at 259. We therefore conclude that the third *Mosley* factor weighs strongly in favor of the State. *See id*.

5

Furthermore, even if the complained-of comment during opening statement constituted an impermissible comment on Appellant's right not to testify, we determine beyond a reasonable doubt that it did not contribute to Appellant's conviction or punishment. *See* TEX. R. APP. P. 44.2(a); ***Snowden v. State***, 353 S.W.3d 815, 818 (Tex. Crim. App. 2011). For all the above reasons, we overrule issue one.

## HEARSAY AND RIGHT TO CONFRONTATION

In issue two, Appellant contends the trial court erred by admitting Moore's body camera footage into evidence because it constitutes hearsay and violates his constitutional right to confrontation.

### Standards of Review and Applicable Law

We review a trial court's ruling as to the admissibility of evidence under an abuse of discretion standard. ***Henley v. State***, 493 S.W.3d 77, 82-83 (Tex. Crim. App. 2016); ***Manuel v. State***, 357 S.W.3d 66, 74 (Tex. App.—Tyler 2011, pet. ref'd). A trial court abuses its discretion if it acts arbitrarily or unreasonably, without reference to any guiding rules and principles. ***State v. Hill***, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016). If the trial court's ruling is within the zone of reasonable disagreement, we will not disturb it. ***Manuel***, 357 S.W.3d at 74. The erroneous admission of hearsay evidence is nonconstitutional error. *See* ***Solomon v. State***, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); ***Johnson v. State***, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). Nonconstitutional error is reversible only if it affects the Appellant's substantial rights. TEX. R. APP. P. 44.2(b); ***Johnson v. State***, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001).

The Confrontation Clause bars admission of testimonial statements of a witness who does not appear at trial unless (1) the witness is unavailable and (2) the defendant had a prior opportunity to cross-examine the witness. ***Crawford v. Washington***, 541 U.S. 36, 59, 124 S. Ct. 1354, 1369, 158 L. Ed. 2d 177 (2004); *see* U.S. CONST. amend. VI (providing that an accused in a criminal prosecution has the right "to be confronted with the witnesses against him"). The purpose of the Confrontation Clause is to secure the opportunity for cross-examination, which is the primary means for testing the credibility of a witness and the truth of his testimony. ***Johnson v. State***, 490 S.W.3d 895, 909 (Tex. Crim. App. 2016). Non-testimonial statements are not subject to the Confrontation Clause, but they are subject to traditional limits upon hearsay evidence. ***Davis v. Washington***, 547 U.S. 813, 821, 126 S. Ct. 2266, 2273, 165 L. Ed. 2d 177 (2004); *see* ***Woodall v.***

*State*, 336 S.W.3d 634, 642 (Tex. Crim. App. 2011) ("[T]o implicate the Confrontation Clause, an out-of-court statement must (1) have been made by a witness absent from trial and (2) be testimonial in nature."). In determining whether statements are testimonial, "Texas courts have generally looked to the degree of formality of a declarant's interaction with the police, the purpose and structure of police questioning, and the likelihood that the declarant expects that the statements could be used in a criminal prosecution." *Cook v. State*, 199 S.W.3d 495, 497-98 (Tex. App.— Houston [1st Dist.] 2006, no pet.). In determining whether a statement is testimonial, we review the totality of the circumstances, and we may consider the following non-exclusive factors, including whether: (1) the situation was still in progress, (2) the questions sought to determine what was presently happening as opposed to what happened in the past, (3) the primary purpose of the interrogation was to render aid rather than to memorialize a possible crime, (4) the questioning was conducted in a separate room, and (5) the events were deliberately recounted in a step-by-step fashion. *Vinson v. State*, 252 S.W.3d 336, 339 (Tex. Crim. App. 2008) (citing *Davis*, 547 U.S. at 829-30, 126 S. Ct. at 2278).

We defer to the trial court's determination of historical facts and credibility, but we review de novo its constitutional legal ruling whether a statement is testimonial or non-testimonial. *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006). If an appellate court concludes that a constitutional error occurred, the court must reverse unless it determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a).

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Hearsay evidence is not admissible except as provided by statute, the Texas Rules of Evidence, or other rules prescribed pursuant to statutory authority. TEX. R. EVID. 802. The excited utterance exception, upon which the State relied at trial, is a recognized exception to the hearsay rule, and it applies to "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." TEX. R. EVID. 803(2); *see McCarty v. State*, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008).

The excited utterance exception is based on the assumption that when the declarant makes the statement, he is not capable of the kind of reflection to enable him to fabricate information. *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005). For the excited utterance exception to apply, (1) the "exciting event" should be startling enough to evoke a truly spontaneous

reaction from the declarant, (2) the reaction to the startling event should be quick enough to avoid the possibility of fabrication, and (3) the resulting statement should be sufficiently related to the startling event to ensure that the statement is reliable and trustworthy. *McCarty*, 257 S.W.3d at 241. The issue is not the specific type of emotion by which the declarant was dominated, but whether the declarant was still dominated by the emotion caused by the startling event when he spoke. *Coble v. State*, 330 S.W.3d 253, 294 (Tex. Crim. App. 2010). In determining whether the declarant was still dominated by the emotion, the court may consider the length of time between the occurrence and the statement, the nature of the declarant, whether the statement was made in response to a question, and whether the statement is self-serving. *Apolinar*, 155 S.W.3d at 187. The trial court may also consider the declarant's appearance, behavior, and condition at the time he made the utterance to determine the occurrence of an exciting event and the declarant's personal perception of it. *Ross v. State*, 154 S.W.3d 804, 809 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). We must determine "whether the statement was made under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection." *Villanueva v. State*, 576 S.W.3d 400, 406 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd).

**Analysis**

Appellant contends the trial court erred by (1) admitting Moore's body camera footage because it violated his right to confront witnesses against him, and (2) admitting the footage as an excited utterance over his hearsay objection. We disagree as to both arguments.

We first address Appellant's contention that admission of the body camera footage violated his rights under the Confrontation Clause. Appellant argues that the State could have called all of the witnesses from the body camera footage and that the body camera video "was not necessary to establish what happened[.]" We disagree. The footage shows what Moore encountered as the first officer who responded to the scene of the shooting. Moore asked basic questions of six witnesses at the scene, four of whom testified at trial, and he obtained their identifying information. The two witnesses who did not testify were a non-English speaking man for whom another witness translated[2] and a female witness who provided a description of Appellant, his attire, his vehicle, and his vehicle's license number. On the body camera footage, Moore can be heard conveying to dispatch the information he obtained from various witnesses.

---

[2] The witness who translated testified at trial.

8

As previously stated, four of the witnesses shown on the body camera footage testified at trial, and the admission of the footage of their statements at the scene therefore does not violate the Confrontation Clause. *See* U.S. CONST. amend. VI; *Crawford*, 541 U.S. at 59, 124 S. Ct. at 1369. With respect to the two witnesses who did not testify at trial, considering their statements in context, we conclude that the primary purpose of their statements was to assist the police with an ongoing emergency. *See Davis*, 547 U.S. at 828. Brockman was lying mortally wounded on the pavement after having been shot minutes before, and Appellant fled the scene in a vehicle and was known to be armed. The witnesses' statements to Moore were not a weaker substitute for live testimony at trial. *See id*. The situation was still in progress, the witnesses were not interviewed in a separate room, and the witnesses did not recount events in a step-by-step fashion. *See Vinson*, 252 S.W.3d at 339. For all these reasons, we conclude that the trial court did not err by determining that the witnesses' statements were non-testimonial, and the admission of the body camera footage therefore did not violate Appellant's rights under the Confrontation Clause. *See id*.; *see also Davis*, 547 U.S. at 828.

We turn now to Appellant's argument that admission of the body camera footage was impermissible because it is hearsay and does not fit the excited utterance exception to the hearsay rule. Moore arrived at the scene minutes after the shooting, and he responded affirmatively when asked whether the witnesses were still operating under the excitement of what they saw. Although the footage shows that the witnesses were able to speak coherently to Moore, it also shows that each of them was shaken by the situation. Most, if not all, of the witnesses appeared to be in a position from which they could see the victim. We conclude that the trial court's determination that the witnesses were still dominated by the emotions caused by the startling event when they made their statements is well within the zone of reasonable disagreement. *See Manuel*, 357 S.W.3d at 74. The trial court therefore did not abuse its discretion by admitting the body camera video into evidence under the excited utterance exception to the hearsay rule. *See* TEX. R. EVID. 803(2); *McCarty*, 257 S.W.3d at 239, 241-42. We overrule issue two.

9

## ADMISSION OF REPORTS INTO EVIDENCE

In issue three, Appellant argues that the trial court abused its discretion by admitting into evidence the reports of Phetteplace and Lloyd over his objection that they constituted impermissible hearsay. According to Appellant, "[t]he reports at issue are effectively a police report."

## Standard of Review and Applicable Law

We review the trial judge's admission of evidence for abuse of discretion, and we will uphold the trial court's decision if it falls within the zone of reasonable disagreement. *Henley*, 493 S.W.3d at 82-83; *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). A trial court's erroneous admission of evidence is generally nonconstitutional error. *Potier v. State*, 68 S.W.3d 657, 663 (Tex. Crim. App. 2002); *Stovall v. State*, 140 S.W.3d 712, 718 (Tex. App.—Tyler 2004, no pet.). We must disregard any nonconstitutional error that does not affect an appellant's substantial rights. TEX. R. APP. P. 44.2(b). The erroneous admission of evidence does not affect substantial rights if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury or had but a slight effect. *Solomon*, 49 S.W.3d at 365.

## Analysis

As stated above, Phetteplace testified that the cartridge case was fired from the pistol recovered from Appellant's car and that the bullet recovered from Brockman's body was a .380-caliber bullet. Lloyd testified that Appellant's hands were positive for gunshot residue. Both witnesses' reports were admitted into evidence during their testimony.

Texas Rule of Evidence 803(8) creates a general exception to the hearsay rule for public records. TEX. R. EVID. 803(8). However, Rule 803(8)(A)(ii) specifically excepts from the purview of the rule reports of matters observed by law-enforcement personnel. *Id*. R. 803(8)(A)(ii). Both witnesses testified regarding their methodologies and the results of their examination and testing, and Appellant did not object to their testimony regarding the information shown in their reports. Assuming without deciding that the reports of Phetteplace and Lloyd constituted inadmissible hearsay, after reviewing the entire record, we have fair assurance that the admission of the reports did not influence the jury or had but a slight effect. *See* TEX. R. APP. P. 44.2(b); *Solomon*, 49 S.W.3d at 365. Accordingly, we overrule issue three.

## ADMISSION OF EVIDENCE OF UNADJUDICATED MURDERS DURING PUNISHMENT PHASE

In issue four, Appellant argues that the trial court erred by admitting evidence of four unadjudicated murders during the punishment phase. Appellant maintains that the probative value of said evidence was greatly outweighed by its prejudicial effect, and he contends the evidence gave the jury "cause for speculation that [he] is a serial killer."

## Standard of Review and Applicable Law

A trial court has broad discretion in determining the admissibility of evidence presented during the punishment phase of trial and may admit evidence deemed relevant to sentencing, including evidence of other crimes or bad acts. *Schultze v. State*, 177 S.W.3d 26, 40 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). As previously discussed, we review the trial judge's admission of evidence for abuse of discretion, and we will uphold the trial court's decision if it falls within the zone of reasonable disagreement. *Henley*, 493 S.W.3d at 82; *Devoe*, 354 S.W.3d at 469. The erroneous admission of evidence is generally nonconstitutional error, and we must disregard any nonconstitutional error that does not affect an appellant's substantial rights. TEX. R. APP. P. 44.2(b); *Potier*, 68 S.W.3d at 663; *Stovall*, 140 S.W.3d at 718. The erroneous admission of evidence does not affect substantial rights if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury or had but a slight effect. *Solomon*, 49 S.W.3d at 365.

"[T]he admissibility of evidence during 'the punishment phase of a non-capital trial is a function of policy rather than a question of logical relevance.'" *Ellison v. State*, 201 S.W.3d 714, 719 (Tex. Crim. App. 2006) (quoting *Sunbury v. State*, 88 S.W.3d 229, 233 (Tex. Crim. App. 2002)). During the punishment phase, relevant evidence is that which assists the jury in determining the appropriate sentence for the particular defendant under the circumstances presented. *Id. Rogers v. State*, 991 S.W.2d 263, 265 (Tex. Crim. App. 1999). The jury is entitled to consider "any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, [and] the circumstances of the offense for which he is being tried[.]" TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (West Supp. 2022). The jury may also consider evidence of an extraneous crime "that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act." *Id*.

Rule 403 of the Texas Rules of Evidence provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. "Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial." *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991) (op. on reh'g). A Rule 403 analysis must balance

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006); *see also Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004). "It is only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value that Rule 403 is applicable." *Jones v. State*, 944 S.W.2d 642, 653 (Tex. Crim. App. 1996).

## Analysis

By enacting Article 37.07, Section 3(a)(1), the Legislature determined that character evidence and evidence of extraneous crimes that are shown beyond a reasonable doubt to have been committed by the defendant are relevant to the issue of punishment. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1). We begin our analysis with the first two *Gigliobianco* factors: the inherent probative force of the evidence of the unadjudicated murders and the State's need for said evidence. *See Gigliobianco*, 210 S.W.3d at 641. The evidence of the four unadjudicated murders was highly probative due to the similarity between those murders and Brockman's murder, and the evidence is relevant to both Appellant's character and pattern of behavior. The trial court's conclusion that the evidence was highly probative and that the State's need for the evidence was significant is not outside the zone of reasonable disagreement. We conclude that the first two *Gigliobianco* factors weigh in favor of admitting the evidence. *See id.*

With respect to the third and fourth *Gigliobianco* factors, any tendency of the evidence to suggest decision on an improper basis and any tendency of the evidence to confuse or distract the jury from the main issues, the trial court could have reasonably concluded that the evidence of the

unadjudicated murders did not tend to suggest decision on an improper basis or to distract the jury from the main issues. Extraneous crimes that are shown beyond a reasonable doubt by evidence to have been committed by Appellant are relevant factors for the jury to consider in determining the appropriate sentence for him under the particular circumstances presented. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1); *Ellison*, 201 S.W.3d at 719; *Rogers*, 991 S.W.2d at 265. As discussed above, a ballistics expert testified that the .380-caliber handgun recovered from Appellant's car fired the cartridge casings recovered from the crime scenes where the four additional murder victims were found. Additionally, the punishment charge instructed the jury not to consider evidence regarding other wrongful acts by Appellant unless it first found and believed beyond a reasonable doubt that Appellant committed such other act or acts. We conclude that the third and fourth *Gigliobianco* factors weigh in favor of admitting evidence of the unadjudicated murders, and the trial court's determination is not outside the zone of reasonable disagreement. *See Gigliobianco*, 210 S.W.3d at 641-42.

We turn now to the fifth *Gigliobianco* factor, any tendency of the evidence to be given undue weight by a jury unprepared to evaluate its probative force. As mentioned above, the trial judge instructed the jury not to consider the extraneous murders unless it found beyond a reasonable doubt that Appellant committed them. Additionally, the jury heard evidence of Appellant's previous convictions and his membership in a criminal street gang. The trial court could have reasonably concluded that the jury would not give undue weight to the evidence of the extraneous murders, and its determination is not outside the zone of reasonable disagreement. We conclude that the fifth *Gigliobianco* factor weighs in favor of admitting the evidence.

With respect to the sixth *Gigliobianco* factor, the likelihood that the evidence will consume an inordinate amount of time or merely repeat evidence already admitted, the State's introduction of evidence pertaining to the four unadjudicated murders comprised the bulk of its case during punishment and consumed much of the punishment phase. However, the evidence of the extraneous murders did not merely repeat other evidence. We conclude that because the evidence regarding the extraneous murders consumed a large portion of the punishment phase, the sixth *Gigliobianco* factor weighs slightly in favor of Appellant. *See id*.

After balancing each of the *Gigliobianco* factors in performing its Rule 403 analysis, the trial court could have reasonably concluded that the probative value of the extraneous murders was not substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403;

*Gigliobianco*, 210 S.W.3d at 641-42. Therefore, the trial court did not abuse its discretion by admitting evidence of the four unadjudicated murders. *See* TEX. R. EVID. 403; *Gigliobianco*, 210 S.W.3d at 641-42. Accordingly, we overrule issue four.

## COURT COSTS

In issue five, Appellant asserts that because the statute authorizing collection of a Local Consolidated Fee on Conviction of Felony applies only to convictions for offenses committed on or after January 1, 2020, the trial court erred by assessing certain fees that are constituent parts of the Local Consolidated Fee on Conviction of Felony. The State concedes that the Records Management and Preservation Fee, County Jury Fund Fee, County Specialty Court Account, and Time Payment Fee were erroneously assessed, but contends that the remainder of the fees were properly assessed.

The date of Appellant's offense is December 16, 2018. The Local Consolidated Fee on Conviction of Felony only applies to defendants who are convicted of offenses committed on or after January 1, 2020. TEX. LOC. GOV'T CODE ANN. § 134.101 (West 2021). Section 134.101 sets forth particular funds and accounts to which a percentage of the $105 Local Consolidated Fee on Conviction of Felony is to be allocated, which include the following: (1) clerk of the court account, (2) county records management and preservation fund, (3) county jury fund, (4) courthouse security fund, (5) county and district court technology fund, and (6) the county specialty court account. *Id*. § 134.101(b).

The bill of costs indicates that Appellant was charged the following fees: $5 arrest fee, $40 clerk of the court fee, $133 consolidated court costs fee, $4 county and district court technology fund, $1 county jury fund, $25 county records management and preservation, $25 county specialty court account, $10 courthouse security fund, $0.60 judicial support fee (county), $5.40 judicial support fee (state), $2.50 records management and preservation fee, and $15 time payment fee. *See id*. Because Appellant's offense date was before January 1, 2020, we conclude that the trial court improperly assessed some of these fees, as explained below. *See id*. § 134.101.

We agree with the State that Article 102.017(a) of the Texas Code of Criminal Procedure, which was in effect on the date of Appellant's offense (*i.e.* prior to the enactment of Section 134.101 of the Local Government Code), provided for a fee of $5 for the courthouse security fund. Act of April 11, 1997, 75th Leg., R.S., ch. 12 § 1, 1997 Tex. Gen. Laws 51, 51 (amended 2019)

14

(current version at TEX. CRIM. PROC. ANN. art. 102.017(a) (West Supp. 2022)). Additionally, we agree with the State that Article 102.005(a) of the Texas Code of Criminal Procedure, which was in effect on the date of Appellant's offense, provided for a fee of $40 for the clerk of the court. Act of May 27, 1995, 74th Leg., R.S., ch. 764, §1, 1995 Tex. Gen. Laws 3969. Furthermore, we agree with the State that Article 102.0169 of the Texas Code of Criminal Procedure provided for payment of a $4 fee for the county and district court technology fund. Act of May 31, 2009, 81st Leg., R.S., ch. 1183, §1, 2009 Tex. Gen. Laws 3753, 3753.

The Texas Code of Criminal Procedure requires that a person convicted of a felony or misdemeanor pay a reimbursement fee of $15.00 if the person fails to pay any part of a fine, court costs, or restitution within 30 days after the court enters the judgment ordering such payment. TEX. CODE CRIM. PROC. ANN. art. 102.030 (West Supp. 2022). However, in *Dulin v. State*, 620 S.W.3d 129 (Tex. Crim. App. 2021), the Texas Court of Criminal Appeals found that a pending appeal suspends a defendant's duty to pay fines, court costs and restitution, which duty is triggered only by a final judgment. *Dulin*, 620 S.W.3d at 133. Thus, the pendency of an appeal "stops the clock" for purposes of the time payment fee. *Id*. A trial court's assessment of a time payment fee before the appellate mandate issues therefore lacks any basis and is premature. *See id*.; *Pruitt v. State*, 646 S.W.3d 879, 886 (Tex. App.—Amarillo 2022, no pet.).

We agree with Appellant that the $2.50 records management fee, the county jury fund fee of $1, the county specialty court fee of $25, and the courthouse security fee of $10 are improper because the statute which provides for their assessment only applies to offenses committed on or after January 1, 2020. *See* TEX. LOC. GOV'T CODE ANN. § 134.101. Moreover, we agree with Appellant that the time payment fee was prematurely assessed. *See Dulin*, 620 S.W.3d at 133. For all these reasons, we sustain issue five in part and modify the trial court's judgment and bill of costs by deleting the $2.50 records management and preservation fee, the county jury fund fee of $1, the county specialty court account fee of $25, and the time payment fee of $15, and we further modify the trial court's judgment and bill of costs to reflect a courthouse security fee of $5 rather than $10. Our ruling is without prejudice to future assessment of the time payment fee if, more than thirty days after our mandate issues, Appellant fails to completely pay any fine, court costs, or restitution he owes.

15

## DISPOSITION

Having overruled issues one, two, three, and four, and having sustained issue five in part, we *modify* the trial court's judgment and *affirm* the trial court's judgment *as modified*.

**GREG NEELEY**
Justice

Opinion delivered May 10, 2023.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)

16



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MAY 10, 2023**

**NO. 12-22-00042-CR**

**KRISTIAN LEONARDO PERDOMO,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 114th District Court
of Smith County, Texas (Tr.Ct.No. 114-0279-19)

THIS CAUSE came to be heard on the appellate record and the briefs filed herein, and the same being considered, it is the opinion of this court that the bill of costs and the judgment of the court below should be modified and as modified, affirmed.

It is therefore ORDERED, ADJUDGED and DECREED that the bill of costs and judgment of the court below be **modified** to delete the $2.50 records management and preservation fee, the county jury fund fee of $1, the county specialty court account fee of $25, and the time payment fee of $15, and to reduce the courthouse security fee to $5; in all other respects the judgment of the trial court is affirmed; and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*